IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

BOBBIE METROKA-CANTELLI,

                Plaintiff,              Case No. 3:12 CV 242

    -vs-

POSTMASTER GENERAL, et al.,        <u>FINDINGS OF FACT AND
CONCLUSIONS OF LAW</u>

                Defendants.

KATZ, J.

      Plaintiff Bobbie Metroka-Cantelli ("Plaintiff") initiated this action against Megan Brennan, Postmaster General, United States Postal Service ("Defendant" or "USPS") for interference under the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2615(a)(1) (2012).

      This matter is before the Court for findings of facts and conclusions of law following a bench trial.  At trial, both sides called numerous witnesses and submitted hundreds of pages of exhibits.  Subsequently, both parties filed proposed findings of fact and conclusions of law. (Doc. Nos. 90, 91).  The Court has jurisdiction pursuant to 28 U.S.C. § 1331.  Pursuant to Fed. R. Civ. P. 52(a), the Court sets forth the following findings of facts and conclusions of law.

**FINDINGS OF FACT**

*USPS Workforce Classifications*

1.      USPS letter carriers are essentially divided into two categories: career and non-career. Career letter carriers are full-benefit, permanent employees assigned to one postal office for the duration of their employment with the USPS.

2.      As a cost-saving measure, the USPS implemented a temporary, non-career supplemental

workforce that allows the USPS flexibility without commitment to a career employee. These temporary, or non-career, employees are also designed to cover for career carriers during vacation or other leave. Generally, these temporary employees are in high demand during the summer months when career carriers take vacation.

3. The USPS temporary employees are bargaining unit members represented by the National Association of Letter Carriers ("NALC"). Over the years, temporary letter carriers have had different names, each governed under the terms of a specific collective bargaining agreement ("CBA"). For the CBA negotiated between 2001-2006, the temporary letter carrier was known as a casual. For the CBA negotiated 2006-2011, the temporary employee was known as a transitional employee ("TE"). Under the current CBA, the temporary letter carrier is known as a city carrier assistant ("CCA").

4. Plaintiff began her career with the USPS in September 2004 as a casual letter carrier. In 2005, she became a rural carrier associate, which led to a permanent career position. She stayed in this permanent position until March 2008, when she had her third child. In May 2008, Plaintiff resumed working for the USPS as a TE. Plaintiff opted to return as a TE because it gave her the opportunity to work more hours and make more money. During the events giving rise to this lawsuit, Plaintiff was employed as a TE.

5. Several memoranda of understanding (MOUs) governed the TEs' terms of employment, including separation, and the contractual cap that limited the number of TEs based on the percentage of career employees.

6. Aside from their personnel classifications, career carriers and TEs performed the same job functions on a daily basis. In addition, TEs were treated the same as career employees for purposes of FMLA eligibility.

2

7.      The term of appointment for a TE was not to exceed ("NTE") 360 days, followed by a mandatory five-day break in service between appointments. While there was no contractual guarantee of reappointment, it was common practice for the USPS to renew appointments automatically.[1]

*USPS Service Areas and NALC Contractual Obligations*

8.      The USPS nationwide service area is divided into "Areas." These Areas are further divided into "Districts." The Districts are then managed by Post Office Operations Managers ("POOMs") in charge of specific zip codes, or POOM groups. POOMs supervise the Postmasters for each individual post office assigned within their POOM groups.

9.      To maintain TE cap compliance, the USPS headquarters analyzed data from a system known as New on Rolls Paid Employee Statistics ("NORPES"). Bernis Owens, the Manager of Field Staffing and Support at USPS headquarters described this data as a "results indicator," or an "after the fact look at how [certain Areas] performed" in terms of cap compliance for a particular reporting or pay period.

10.     Based on this data, the USPS headquarters would configure TE allocations for each Area based on the percentages of career employees established by the TE cap. USPS headquarters would then relay this information to each "Area Compliment Coordinator." In turn, the Area Compliment Coordinator would send TE allocation numbers to the "District Compliment Coordinator" and members of the "District Human Resources Management Board ("HRMB" or

---

1. The parties avidly disputed this point. Testimony revealed it was common practice for the USPS to reappoint or "re-up" a TE after their five-day break. This is borne out by the fact that TEs were not required to reapply for their positions – they would simply show up to work after their five-day break and check the schedule – and employment forms for the next appointment were processed a week or two before the TEs NTE date, i.e., before their five-day break and "separation" from employment.

3

"Complement Committee") with a cap they could not exceed.

11.     NORPES data was also provided to the NALC to report on compliance with the contractual cap. Area and District Compliment Coordinators were expected to maintain compliance with the TE allocation in an effort to avoid a contractual violation with NALC. The HRMB, therefore, would meet regularly to discuss and monitor staffing levels at the USPS offices within their District, including the number of TEs assigned to various POOM groups.

12.     The HRMB utilized webCOINS – a data entry system which tracked real-time employment statistics of career and non-career employees – to analyze employee rolls and determine whether they were in compliance with their TE allocations and caps.

13.     Rich Ryman, the Eastern Area Compliment Coordinator, explained that if he saw he was over the cap in webCOINS, it was possible to comply or fix that number by separating or moving a TE before non-compliance was reflected in NORPES. Collective testimony revealed employee data from webCOINS changed on a daily basis. Due to this fluidity, there was no documentary evidence reflecting the webCOINS data for the relevant time period at issue.

14.     In 2010, Plaintiff worked in the Norwalk Post Office in Norwalk, Ohio, located in the Ohio Northern District in the Eastern Area. At this time, Owens was the Manager of Field Staffing and Support at USPS headquarters; Ryman was the Eastern Area Compliment Coordinator; Carol Neubauer was the Ohio Northern District Compliment Coordinator; Ellen Rohrbacher was the acting POOM for zip codes (or POOM group) beginning with 446 and 448; and Ed Andres was the Postmaster at the Norwalk Post Office.

*Plaintiff's FMLA Activity and Separation*

15.     Plaintiff became pregnant in the fall of 2009. Sue Gliatta was Plaintiff's supervisor at the Norwalk Post Office during that time. Sometime in March or April of 2010, Plaintiff told Gliatta

she was pregnant, and Gliatta suggested Plaintiff apply for FMLA leave in anticipation of the baby's arrival.

16. On April 8, 2010, Plaintiff called the USPS's human resources department and spoke with USPS FMLA coordinator Bernice Mazeke. Plaintiff informed Mazeke she was pregnant and requested an FMLA packet.

17. In her capacity as FMLA coordinator, Mazeke was responsible for determining FMLA eligibility for career and TE employees. For TEs, Mazeke would check the system for an employee's "entered on duty date" to determine the individual's FMLA eligibility.

18. Based on Plaintiff's entered on duty date and hours worked, Mazeke determined Plaintiff was FMLA eligible and sent her an FMLA packet, which included FMLA certification forms.

19. Mazeke testified she used a computer system called Enterprise Resource Management System ("ERMS") to track FMLA activity. Mazeke entered Plaintiff's FMLA packet request into ERMS around the same date of her phone call on April 8, 2010. This process created an FMLA case number with a status of "pending" that could be viewed by management with access to ERMS.

20. Mazeke further testified that an employee's FMLA file was closed within fifteen days if completed certification forms were not returned. It is undisputed Plaintiff did not return the certification forms. This fifteen day requirement, however, relates only to the USPS's policy to close pending FMLA files. It does affect an individual's qualification for leave under the FMLA.

21. The birth of a child is a qualifying event under the FMLA and the USPS's policies recognize it as such. When a qualifying event is foreseeable, such as the birth of a child, the USPS requires eligible employees to complete the certification forms within 30 days before the

5

start of the individual's leave. Because Plaintiff's due date was in July 2010, she was not required to return the packet – per USPS policy – until sometime in June 2010.

22. Before Plaintiff was able or required to return her packet, however, she was informed she would not be re-appointed after her NTE date. Specifically, Plaintiff received a letter on May 5, 2010, indicating she would "be separated from the Postal Service on May 15, 2010[,]upon completion of [her] appointment." (Ex. 1). Testimony was conclusive that this type of TE separation was rare in the Ohio Northern District.

*USPS's Cap Compliance and Decision to Separate Plaintiff*

23. On March 16, 2010, an email from Ryman revealed the Eastern area was "over the CAP on contractual TEs" and the numbers were very tight.

24. For the pay periods ending April 23, 2010, and May 7, 2010, the NORPES data reflected the Eastern Area was over the TE cap by nine and twelve, respectively. (Ex. 12-13). The data also showed a decline in the number of career carriers, which in turn affected TE allocation percentage.

25. With respect to the Ohio Northern District, Ryman testified he gave the directive to separate one TE to comply with the cap. Neubauer – the Ohio Northern District Compliment Coordinator – testified she received this directive from Ryman to reduce.

26. On May 3, 2010, the HRMB met to discuss TE reduction. The HRMB consisted of Human Resources Manager Annette Dressler, Neubauer, and other unspecified management personnel. Rohrbacher and approximately four other POOMs were also in attendance. At the HRMB meeting, Rohrbacher was instructed to separate the next TE on break in her POOM group due to non-compliance with the cap. She was given this instruction by management personnel at the HRMB meeting based on the directive by Ryman.

6

27. There were no minutes of the HRMB meeting. Dressler and Neubauer testified minutes were not necessary because the instruction to reduce would be reflected in personnel paperwork subsequent to separation.

28. Based on the instruction to reduce, Rohrbacher utilized webCOINS to determine which TE was nearing their NTE date. Because Plaintiff's name was next on the list, she was chosen for separation. Rohrbacher explained, "I made that decision [to terminate Plaintiff] based on my instruction to reduce my TE complement, and then I used a web application that we have called webCOINS, I [pulled] data of all the TEs under my functional area and I did a sort on their not to exceed date [NTE], and she was at the top."

29. Jarrod Nighswander – Plaintiff's co-worker and also a TE within Rohrbacher's POOM group – had an NTE or separation date of May 5, 2010. Logically, Plaintiff argued Nighswander should have been separated instead. It was revealed at trial, however, that Nighswander's paperwork for reappointment had been processed on April 27, 2010. For this reason, he was not chosen for separation and was not listed "next up" in webCOINS.

30. In her capacity as acting POOM, Rohrbacher was in charge of staffing for approximately 1,800 employees at 135 post offices within her POOM group. Rohrbacher did not know Plaintiff, nor did she have any knowledge of her pregnancy or pending FMLA activity. She separated Plaintiff based on a directive to reduce her TE compliment due to the Eastern Area's non-compliance with the cap.

31. The same day the HRMB meeting took place – May 3, 2010 – Rohrbacher instructed Andres – the Norwalk Postmaster – not to renew Plaintiff's appointment. She explained, "I didn't tell [Andres] to terminate her. I just told him we weren't going to be in a position to reappoint her. So the paperwork he would have to do to reappoint her, we wouldn't want to do

7

that.  And we need[ed] to notify her that we were not renewing her."

32.     By letter post-marked May 4, 2010, Andres informed Plaintiff she would be separated from the USPS upon completion of her appointment.

33.     Subsequent to Plaintiff's separation, the USPS posted some questionable advertisements requesting temporary work relief.  It was revealed during trial, however, that these postings were either unrelated to Plaintiff's prior position or unsubstantiated.

34.     For instance, on May 14, 2010, a USPS Northern District bulletin contained an advertisement stating  "Temporary Relief Carriers Needed" and requested applicants to apply utilizing the USPS website "eCareer.com."  (Ex. 43).  Testimony revealed this position was for a temporary rural position, not a TE position, and was separate and apart from any contractual obligations with respect to TE cap compliance.

35.     Next, an undated TE schedule revealed Plaintiff had been terminated and indicated there was a "New TE posting" on the USPS's eCareer website.  (Ex. 48).  Plaintiff set forth no evidence or testimony, however, that a posting actually existed for this position on the USPS eCareer website, or that anyone was hired to replace her.[2]

36.     Instead, the testimonial evidence revealed the USPS implemented a TE hiring freeze due to cap compliance issues on May 20, 2010 – roughly two weeks after Andres notified Plaintiff she would not be re-appointed, and five days after her NTE date.

## CONCLUSIONS OF LAW

### A.  *FMLA Interference*

1.      The FMLA entitles an eligible employee to as many as twelve weeks of job-protected

---

2. Plaintiff testified she thought "Ms. Rurlman" was hired; however, this testimony was unsubstantiated.

unpaid leave for the birth or placement of a son or daughter, to bond with a newborn or newly placed son or daughter, or to care for a son or daughter with a serious health condition. 29 U.S.C. § 2612(a)(1).

2. An employee need not specifically mention the FMLA when taking leave. *Arban v. West. Pub. Corp.*, 345 F.3d 390, 400 (6th Cir. 2003). All the employee must do is notify the employer that FMLA-qualifying leave is needed. 29 C.F.R. § 825.303(b).

3. The FMLA interference theory of recovery arises from 29 U.S.C. § 2615(a)(1), which states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise, or attempt to exercise" protected FMLA leave.

4. "To prevail under the interference theory [of the FMLA], the employee must establish the following: (1) [s]he was an eligible employee; (2) the defendant is an employer; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of his intention to take leave; and (5) the employer denied the employee FMLA benefits to which he was entitled." *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2007).

5. The Sixth Circuit "recently held that it is appropriate to apply the *McDonald Douglas* burden-shifting analysis when an employer seeks to prove that it would have terminated the employee's position regardless of whether she took FMLA leave." *Saulter v. Detroit Area Agency on Aging*, 562 F. App'x 346, 360 (6th Cir. 2014) (citing *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012)).

6. An employer, therefore, "may prove it had a legitimate reason unrelated to the exercise of FMLA rights to terminating the employee" and "the plaintiff [can] rebut the employer's reason by showing that the proffered reason had no basis in fact, did not motivate the termination, or was insufficient to warrant the termination." *Donald*, 667 F.3d at 762 (citing *Grace v. USCAR*,

521 F.3d 655, 670 (6th Cir. 2008)).

*B. Prima Facie Case*

7. Plaintiff easily established the first two elements of her prima facie burden during trial. Mazeke – the USPS's FMLA Coordinator – testified Plaintiff was an eligible employee and the USPS was an employer pursuant to the Act.

8. Plaintiff also satisfied her burden with respect to the third element when Mazeke testified Plaintiff would have been entitled to FMLA leave for bonding time upon the birth of her child had she not been separated. 29 U.S.C. § 2612. Important here, it is unlawful for an employer to interfere with an employee's "attempt to exercise" FMLA leave. § 2615(a)(1).

9. The Court also finds Plaintiff met her prima facie burden regarding notice. While an employee must provide notice and a qualifying reason for requesting the leave, he need not actually mention the FMLA by name. *Brohm v. JH Properties, Inc*., 149 F.3d 517, 523 (6th Cir. 1998). For example, where an employee had discussed the FMLA with his supervisor, the employee's notice to his employer was adequate even though the employee failed to mention the FMLA in his request for leave. *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003).

10. Instead,"[t]he critical question is whether the information imparted to the employer is sufficient to reasonably apprize it of the employee's request to take time off for a serious health condition." *Brohm*, 149 F.3d at 523 (internal quotation omitted).

11. Employers cannot interfere with FMLA rights by enforcing the FMLA's notice requirements in a way that conflicts with the FMLA's requirements. *Cavin v. Honda of Am. Mfg., Inc*., 346 F.3d 713, 719-23 (6th Cir. 2003) (employee gave adequate notice to security department although he did not satisfy the company's extra step of calling the leave administrator).

12. "[W]hat is practicable, both in terms of the timing of the notice and its content, will depend upon the facts and circumstances of each individual case." *Cavin*, 346 F.3d at 724 (quoting *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 764 (5th Cir. 1995); *see also Walton v. Ford Motor Co.*, 424 F.3d 481, 486 (6th Cir. 2005).

13. Plaintiff informed her immediate supervisor (Gliatta) that she was pregnant. Gliatta suggested Plaintiff formally apply for FMLA bonding time. Pursuant to USPS policy, Plaintiff contacted the USPS human resources office to request an FMLA packet. Plaintiff spoke with Mazeke – the USPS FMLA Coordinator – and informed her she was pregnant. Mazeke determined Plaintiff's eligibility and sent her an FMLA packet. Mazeke then entered Plaintiff's information into ERMS, which indicated pending FMLA activity. The Court finds this constitutes sufficient notice.

14. Plaintiff's failure to return the USPS's FMLA certification forms is of no consequence in this case. Mazeke testified Plaintiff was not required to return the forms, per USPS policy, until 30 days before she expected to take leave. There is no dispute Plaintiff was separated before was required to do so. Plaintiff, therefore, did not violate any internal USPS policy that might negate proper notice. *See, e.g.*, *Walton*, 424 F.3d at 487-88 (An employee's notice was insufficient under the FMLA when he attempted to give notice in a manner that the company had specifically said was not adequate).

15. Finally, Plaintiff met her burden with respect to the fifth element – denial of benefit. Clearly, any termination constitutes denial of future FMLA leave simply because an employee cannot take leave once she is no longer employed. This, however, does not make every otherwise legitimate termination actionable under the FMLA. *See*, *e.g., Clark v. Walgreen Co.*, 424 F. App'x 467, 474 (6th Cir. 2011) (no evidence the plaintiff was entitled to future leave

when he was terminated).

16. Accompanying FMLA regulations provide interference claims include those in which an employer discourages an employee from taking FMLA leave, even when the employee has not yet made a formal request:

> Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave. It would also include manipulation by a covered employer to avoid responsibilities under FMLA, for example:
>
>> (1) Transferring employees from one worksite to another for the purpose of reducing worksites, or to keep worksites, below the 50-employee threshold for employee eligibility under the Act;
>> (2) Changing the essential functions of the job in order to preclude the taking of leave;
>> (3) Reducing hours available to work in order to avoid employee eligibility.

29 C.F.R. § 825.220(b).

17. Mazeke testified Plaintiff would have been entitled to leave when her baby arrived had she remained employed by the USPS. This case, therefore, is distinguishable from *Clark*, in which the court found no evidence the plaintiff would have actually been entitled to future FMLA leave. 424 F. App'x at 474. Moreover, because interference includes discouraging an employee from using or applying for FMLA leave, it must also include separating an employee in order to deny leave. § 825.220(b). For these reasons, the Court finds Plaintiff has satisfied her prima facie burden of FMLA interference.

*C. Legitimate Business Reason*

18. The USPS advanced a complement reduction due to non-compliance with the NALC contractual cap as its legitimate business reason for separating Plaintiff.

19. The Sixth Circuit has held that company re-organization or companywide reduction-in-

12

force was a legitimate business reason for terminating an employee. *See Madry v. Gilbraltar Nat'l Corp.*, 526 F. App'x 593, 597 (6th Cir. 2013) ("We have previously found that the restructuring of a business was a legitimate, nondiscriminatory reason for terminating an employee who had incidentally taken FMLA leave.") (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001)); *see also Roll v. Bowling Green Metaforming, LLC*, 457 F. App'x 458, 461-62 (6th Cir. 2012) (holding in FMLA that decision to terminate employee as part of companywide reduction-in-force was not pretextual under the FMLA).

20. The USPS, therefore, has proffered a legitimate business reason for separating Plaintiff.

*C. Pretext*

21. Ultimately, the Court finds Plaintiff has failed to prove her separation was related to FMLA activity, and the USPS showed – by a preponderance of the evidence – that Plaintiff's termination was justified due to a compliment reduction. *See*, *e.g.*, *Gates v. U.S. Postal Service*, 502 F. App'x 485, 490 (6th Cir. 2012).

22. Plaintiff had the opportunity to rebut the USPS's compliment reduction "by showing that the proffered reason had no basis in fact, did not motivate the termination, or was insufficient to warrant the termination." *Donald*, 667 F.3d at 762 (citing *Grace v. USCAR*, 521 F.3d 655, 670 (6th Cir. 2008)).

23. "Unlike its role in establishing a prima facie case, 'the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext.'" *Ritenour v. Tennessee Dept. of Human Servs.*, 497 F. App'x 521, 533 (6th Cir. 2012) (quoting *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012)); *see also Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001); *Donald*, 667 F.3d at 763.

24. The Sixth Circuit has held, however, that "suspicious timing is a strong indicator of

pretext when accompanied by some other, independent evidence." *Bell v. Prefix*, Inc., 321 F. App'x 423, 426 (6th Cir. 2009) (citation omitted).

25. The reasonableness of the employer's decision may be considered to the extent that it sheds light on whether the proffered reason was the actual motivation. *Wexler v. White's Fine Furniture, Inc*., 317 F.3d 564, 576 (6th Cir. 2003).

26. Plaintiff argues the USPS's proffered reason was pretextual for the following reasons: 1) the compliment reduction had no basis in fact; 2) Rohrbacher's decision to separate Plaintiff had no basis in fact; 3) the USPS was seeking temporary carriers within a week of Plaintiff's separation; and 4) the USPS compliment reduction was insufficient to justify Plaintiff's absolute termination.

**The USPS's Compliment Reduction**

27. Plaintiff contends the compliment reduction was factually false because there was no evidence the Northern District in particular was over its cap at any time during the relevant period.

28. The documentary and testimonial evidence, however, revealed cap compliance was determined by Area. The documentary evidence presented at trial conclusively revealed the Eastern Area, as a whole, was over the TE cap during the relevant time period. (Exs. 12-13). Moreover, Ryman, in his capacity as the Eastern Area Compliment Coordinator, testified that he gave the directive to reduce one TE in the Northern District in order to comply with the Eastern Area's contractual obligations with NALC.[3]

---

3. Whether the Sixth Circuit's "honest-belief" rule applies to FMLA interference claims without an accompanying FMLA retaliation claim is unclear. *See Tillman v. Ohio Bell Tel. Co.*, 545 F. App'x 340, 359 (6th Cir. 2013). Regardless, such an application of the rule is irrelevant in this case because the reason for Plaintiff's separation – compliment reduction – was not ultimately

29.     In turn, Neubauer testified she and other members of the HRMB instructed Rohrbacher, the acting POOM for Plaintiff's zip code, to separate one TE.  Testimony revealed the decision to reduce was strictly a cap compliance issue and not related to lack of work.

30.     While there was no documentary evidence of the HRMB's directive to Rohrbacher,  the testimonial evidence was clear the HRMB meeting occurred and the directive to reduce one TE was given.   None of the USPS employees responsible for the reduction –  Owen, Ryman, Dressler, or Neubauer – knew Plaintiff, nor did they specifically choose her for separation.

31.     The individual and collective testimony was credible.  It was clear that a decision was made to separate one TE based on contractual compliance with NALC.  Accordingly, Plaintiff has failed to show the USPS's decision to reduce one TE in the Northern District had no basis in fact.

**Rohrbacher's Decision to Separate Plaintiff**

32.     Plaintiff also argues she was not "next up" for renewal when Rohrbacher chose her for separation.  The decision to separate Plaintiff occurred on May 3, 2010.

33.      It is undisputed Nighswander's NTE date was May 5, 2010, and his reappointment date was May 11, 2010.  Rohrbacher explained, however, that Nighswander's paperwork had already been processed and therefore, his name was not listed in webCOINS as the "next up" for separation.

34.     The Court finds Rohrbacher's testimony credible for a few reasons: 1) it comports with Plaintiff's contention that TE's, in general, were automatically re-appointed, i.e., their paperwork was processed before the expiration of their NTE date; 2) Rohrbacher did not know Plaintiff, and

---

shown to be incorrect.  *Id.* at 349.

therefore did not know she was pregnant; and 3) Rohrbacher was not aware Plaintiff requested an FMLA packet.

35. Rohrbacher testified she did not have access to ERMS for employees within her POOM group when she separated Plaintiff. At the time, she was the "acting POOM" but was filling in for another employee.

36. Moreover, Mazeke testified pending FMLA files are closed within fifteen days if the employee fails to return the FMLA certification forms. Because Plaintiff did not return the forms, her FMLA file was closed fifteen days after her request – around April 23, 2010.

37. Rohrbacher's decision to separate Plaintiff did not occur until May 3, 2010. Therefore, even if Rohrbacher had ERMS access, Plaintiff's pending FMLA file was already closed. A "reason cannot . . . be a pretext for discrimination unless it is shown both that the reason was false, and the discrimination was the real reason." *Seeger*, 681 F. 3d at 285.

38. While Plaintiff satisfied her burden with respect to the prima facie notice requirement, there is no rule of law which requires the Court to impute notice to the decision-maker for purposes of pretext. For the reasons stated above, therefore, Rohrbacher's decision to separate Plaintiff was not pretextual.

**Post-Separation Employment Advertisements and Compliment Reduction Sufficiency**

39. Plaintiff argues the USPS Northern District bulletin advertising for "Temporary Relief Carriers" shows the decision to separate her as a TE was pretextual. (Ex. 43). Testimony revealed, however, that this position was for a temporary rural carrier position – not a TE position – and was unrelated to the USPS's contractual obligations with respect to the TE cap.

40.     Because there was some dispute regarding the USPS's common hiring practices,[4] Plaintiff argued she should have been transferred to the temporary rural carrier position. Testimonial evidence was clear, however, that TE transfers generally occurred within the same craft. For example, "MOU" TEs were switched to "contractual" TEs in order to maintain compliance.[5] It was not common place to transfer a TE (a temporary city carrier) to a temporary relief (a temporary rural carrier) position.

41.     Finally, an undated TE schedule revealed Plaintiff had been terminated and indicated there was a "New TE posting" on the USPS "eCareer" website. (Ex. 48). Plaintiff set forth no evidence or testimony, however, that a posting actually existed for this position on the USPS eCareer website, or that anyone was hired to replace her. Instead, testimony revealed the USPS implemented a TE hiring freeze on May 20, 2010.

42.     Ultimately, Plaintiff was separated from a temporary position which had no guarantee of renewal. It remains that USPS managers – with no knowledge of Plaintiff or her pregnancy – gave the directive to reduce one TE to maintain compliance with the cap. Plaintiff also admitted she never applied for the temporary rural carrier position, or any other rural carrier or TE posting subsequent to her separation.

43.     Plaintiff failed to produce sufficient evidence to convince the Court – as the trier of fact – that the compliment reduction, or her separation related thereto, would not have occurred had she

---

4. Plaintiff filled out one employment application with the USPS in 2004. Because her subsequent positions were offered internally by the USPS, she viewed her separation as a termination and assumed she could not "reapply" for another position. USPS management, however, did not view Plaintiff's separation as negative and indicated Plaintiff could have applied for other positions subsequent to her separation.

5. Testimony revealed this type of personnel transfer (MOU to Contractual TE) was not available at the time Plaintiff was separated.

formally applied for or taken leave. *See Saulter*, 562 F. App'x at 361.

44.     Moreover, Plaintiff has failed to produce credible, independent evidence to support that her separation due to a compliment reduction was pretextual. *Bell*, 321 F. App'x. at 426.

## CONCLUSION

Based upon the foregoing, the Court finds Plaintiff has not established pretext by a preponderance of the evidence. Therefore, USPS is entitled to judgment on Plaintiff's FMLA interference claim. Because the Court has determined a lack of FMLA interference, Plaintiff's request for damages is denied as moot. Accordingly, judgment is entered for USPS on Plaintiff's claim for FMLA interference. Each side is to bear its own costs.

IT IS SO ORDERED.

                                  *S/* David A. Katz
                                  *DAVID A. KATZ*
                                  *U. S. DISTRICT JUDGE*